# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 18, 2012

## STATE OF TENNESSEE v. HENRY FLOYD SANDERS

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-D-3408      Cheryl Blackburn, Judge**

---

**No. M2011-00962-CCA-R3-CD - Filed October 9, 2012**

---

Appellant, Henry Floyd Sanders, was indicted for six counts of aggravated sexual battery and four counts of rape of a child. On appellant's motion, the trial court dismissed one count of aggravated sexual battery on the grounds of insufficient evidence. The jury returned verdicts of guilty on all remaining counts. The trial court ordered appellant to serve partial consecutive sentences of ten years each for the aggravated sexual battery convictions and twenty years each for the rape of a child convictions, yielding an effective forty-year sentence. Appellant raises three issues on appeal: (1) whether the trial court erred in denying his motion to suppress his statements to a third party; (2) whether the trial court erred in denying his motion for judgment of acquittal due to a variance between the bill of particulars and the State's election; and (3) whether the trial court erred in ordering partial consecutive sentences. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher (on appeal); Melissa Harrison (at trial and on appeal); and Jessamine Grice (at trial), Assistant Public Defenders, Nashville, Tennessee, for the appellant, Henry Floyd Sanders.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Sharon Reddick and Kristen Menke, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

### A. Facts from Motion to Suppress

The victim's mother, Latrice Standberry, was the State's first witness at the hearing on the motion to suppress. She testified that appellant is the father of her son. She and appellant were in a relationship for over four years. Their relationship ended in January 2007. Ms. Standberry testified that appellant was a parental figure to both children. After her relationship with appellant ended, Ms. Standberry and appellant still communicated, but it was limited to issues regarding their son. They disagreed a great deal with regard to visitation.

Early in 2008, someone from the victim's school telephoned Ms. Standberry and informed her that the victim had disclosed that she had been sexually abused by appellant. Her first reaction was denial; she did not want to believe that the father of her son had committed such acts against her daughter. As Ms. Standberry learned more of the details, she became bitter. She acknowledged during direct examination that she had an interest in speaking with appellant to hear his side of the matter.

At some point after police were notified and after the victim's forensic interview, Detective Joshua Mayo with the Metropolitan Nashville Police Department asked Ms. Standberry if she would be willing to engage appellant in a recorded conversation. She agreed to assist police but said she would have wanted to have the conversation with appellant to obtain closure regardless of being asked by police. The conversation occurred one afternoon when appellant picked up their son and drove him to Ms. Standberry's house. Appellant was waiting on her when she arrived at her home. She initiated the conversation as they were standing in her driveway close to his vehicle. Detective Mayo and two other detectives were nearby monitoring the conversation.

During her conversation with appellant, police telephoned Ms. Standberry approximately three times to offer suggestions of how she should ask questions to obtain a detailed statement from appellant. Police specifically wanted appellant to admit to "penetration," so they suggested other ways for Ms. Standberry to ask the question. The conversation lasted for more than an hour and a half.

On cross-examination, Ms. Standberry admitted that police wanted her to engage appellant in a recorded conversation because they wanted to obtain a confession. She

-2-

acknowledged that her intent was also to obtain a confession from appellant when she agreed to wear a body wire.

Ms. Standberry admitted telling appellant that they could work out the problem between the two of them if he admitted what he had done, that if he confessed, the police would not have to be involved, that he had the power to stop the situation, that the case would be over if the victim did not show up for her forensic interview, and that she did not want the situation to go any further. She also admitted telling appellant that if he left the matter with her, she would have no choice but to pursue it. She also told him that when the victim went to the forensic interview, everything would come out. Ms. Standberry stated that her purpose in lying to appellant was to obtain a confession. She said, "[I]f it means that I had to fabricate in some way, then whatever I had to do to try to get the truth . . . ."

Detective Mayo testified that he was involved in the investigation of appellant's case. During the investigation, Detective Mayo asked Ms. Standberry to wear a body wire to record a conversation with appellant. Based on his experience, the accused in cases such as this are not usually truthful with police but are often willing to talk about the facts with family members or friends. He contacted Ms. Standberry within one month of initiating the investigation. Detective Mayo testified that Ms. Standberry was willing to assist him. In giving her instructions, he told her to speak with appellant about the allegations and ask him what occurred. He did not specifically instruct her to lie to appellant.

Detective Mayo stated that nothing in the surroundings or environment in which the conversation occurred would have prevented appellant from ending the conversation at any time. Appellant never attempted to end the conversation. Detective Mayo testified that he called Ms. Standberry three to five times to offer encouragement and to suggest specific questions to ask appellant. At some point in the conversation, appellant admitted to inadvertent sexual contact with the victim. Detective Mayo subsequently interviewed appellant, but appellant made no confessions at that time. He maintained his innocence.

The recorded conversation and transcript were admitted into evidence. In the transcript, Ms. Standberry offers several assurances that the matter does not have to go any further, that she wanted it to end there, and that if appellant confessed, the matter would be over. She also made several threats to report him to the police if he did not cooperate and stated that she would have no other choice than to go forward if appellant did not admit what he had done. Appellant adamantly denied all accusations but eventually admitted to touching the victim's chest during wrestling. He eventually admitted that the victim walked into the bathroom and saw him masturbating, that he touched the victim in the vaginal area while playing but did not penetrate her vaginally, and that he lay on her while they wrestled. He did not admit to sexual intercourse or digital penetration.

## B. Facts from Trial

The victim testified that she and her family moved to Nashville from Mississippi when she was six or seven years old. They first lived in Valley Brook Apartments where she lived with her mother, appellant, and her brother. They later moved into a duplex on Apache Trail. Her mother worked third shift Monday through Friday, and appellant stayed with her and her brother while her mother was at work.

When the victim was in the third grade, she began seeing her school counselor, Peggy Reilly, for an anger problem. During counseling, the victim disclosed that she was being physically abused by her mother and sexually abused by her mother's boyfriend. The victim told her mother about the sexual abuse a few days later. A worker from the Department of Children's Services ("DCS") interviewed the victim and asked her to look at a picture and mark the places corresponding to the places on her body where appellant had touched her. The victim learned in first grade that there are certain places on her body that no one should touch, including her chest and her other private parts.

The victim testified that when they lived in Valley Brook Apartments, appellant touched her in a way that he should not have. He rubbed her thigh and told her to sit on his lap. She felt "nasty" afterward. After they moved to Apache Trail, the victim recalled an incident in which she was lying down and watching television in her bedroom. Appellant came into her room and started rubbing her legs. He took off his pants and asked her to remove her pants. When she refused, appellant removed her pants himself. He then climbed on top of the victim and "started moving his body back and forth." The victim testified that she felt appellant's penis touching her private parts. Appellant was clothed in his underpants, but the victim explained that he removed his penis through the opening in his boxer shorts. Using the diagram, the victim told the jury that appellant's penis touched her private part "between" the line rather than outside the line, indicating penetration. She further testified that "greasy stuff" came out of his penis. She felt it when he ejaculated inside her and observed it when she cleaned herself later. During the encounter, the victim repeatedly asked appellant to stop. She testified that this happened seven to nine more times. She said that it hurt "a lot" each time appellant performed this act on her, but she did not believe that she ever bled afterward. The victim recalled that on approximately two occasions after appellant had been on top of her, he moved, then touched her private area on the "inside."

The victim also recalled an incident in which appellant came into her room and touched her "chest area." She was wearing knee-length shorts and a t-shirt. Appellant lifted her shirt and touched her chest with his hands. She asked appellant to stop and he complied.

-4-

The victim testified that on one occasion, appellant entered her bedroom and touched her private area with his hand. She was lying on her bed and appellant was sitting on the bed. He touched her private area over her clothes. She asked him to stop, but appellant continued for "a long time" after she asked him to stop. On another occasion, he touched her private area on her skin rather than over her clothes. She also recalled an occasion when appellant came into her room wearing only his underwear. He removed his penis from his underwear and told the victim to touch it. She testified that "it was forceful, so I really had no choice but to touch it." She explained that she meant he said it in a forceful voice.

The victim recalled that on one of the occasions that appellant raped her, when he was finished, he told her to touch his penis to see what it felt like. She did not want to touch him, but he repeated it forcefully. She touched his penis and said that it felt "gross." She told the jury that on the occasions appellant asked her to touch his penis, she could feel it "getting pressure," so she removed her hand because it felt "disgusting" to her.

The victim testified that all of the incidents of sexual abuse she had previously described occurred at night after the victim's mother had gone to work. Each incident occurred in her bedroom. After appellant moved out, she and her brother occasionally stayed at appellant's house. Two additional instances of abuse occurred there. On the first occasion, the victim and her brother were playing a video game or watching television in her brother's bedroom. Her brother left the bedroom and went to the living room, where he fell asleep. Shortly thereafter, appellant came into her brother's bedroom and told her to remove her clothing. Because he said it forcefully, she immediately complied. He again climbed on top of the victim and "moved his body back and forth." His private area was touching her private area, again on the "inside" of the line depicted on the drawing. She kept telling appellant to stop and eventually he did. The victim could not recall any specific details about the second instance of abuse at appellant's house except that she removed her clothes in the bathroom and appellant was waiting outside the door wearing only his shorts. From that point, appellant told the victim to lie down on the bed, and the event continued in the same way as the previous incident.

The victim testified that appellant warned her not to tell anyone about what he had done or "something was going to happen." She thought he meant that she would be in trouble but that he would not. He told the victim that her mother was doing drugs and was involved with a married man. Appellant also told the victim that her mother was stupid and "all these other things you shouldn't tell a little girl about [her] mother."

The victim testified that she had a severe anger problem when she was in third grade. People did not want to be around her. She decided to change her ways, so she started talking with Ms. Reilly, the school counselor. She eventually disclosed everything about what

appellant had done to her. She told Ms. Reilly first, then subsequently disclosed everything to her mother. The victim also disclosed to her counselor that her mother physically abused her.

Peggy Reilly testified that she was a counselor for the school system. Her first encounter with the victim was in September 2007 when the victim reported that her mother had hit her. The victim was in third grade at the time. Based on their conversation, Ms. Reilly decided to monitor the situation and determine if a pattern developed. Her next involvement with the victim was on January 25, 2008. The victim reported that appellant had sexually molested her. Ms. Reilly described the victim's exact words as "he made me take off my clothes and touched my private parts." She stated that the victim was hesitant to tell her anything further. As a mandatory reporter for allegations of sexual abuse, Ms. Reilly immediately telephoned the police and DCS. A patrol officer arrived at the school the same day. Ms. Reilly followed up with the victim later to see how she was feeling. The victim told her that her mother was protecting her, and she felt safe.

The victim's mother, Latrice Standberry, testified that appellant is the father of her son. Their relationship began in 2003 when they lived in Mississippi. They moved to Tennessee in 2005 because of Hurricane Katrina. When they first arrived in Tennessee, they lived in Valley Brook Apartments in Nashville with Ms. Standberry's daughter (the victim) and their son. She obtained employment at Walmart, where she worked the third shift. Appellant also worked at Walmart. They subsequently moved to Apache Trail, also in Nashville. In January 2007, Ms. Standberry and appellant ended their relationship. They both moved out of the house on Apache Trail. He moved into an apartment on Linbar Drive.

In January 2008, Ms. Standberry received a telephone call from a DCS caseworker. Based on the information she received from the caseworker, Ms. Standberry believed that authorities would be opening an investigation. Months passed before she heard anything further. In April 2008, DCS contacted Ms. Standberry to request an interview with the victim. A law enforcement officer also contacted her. She cooperated with both individuals. No further action was taken against Ms. Standberry with regard to the allegations of physical abuse of the victim. Detective Mayo informed Ms. Standberry about the victim's allegations of sexual abuse against appellant. She testified that she was not aware of anything happening during the time she resided with appellant. Ms. Standberry attempted to talk with the victim about the allegations, but the victim did not want to discuss the matter. She disclosed information to Ms. Standberry "in bits and pieces."

Ms. Standberry testified that the DCS caseworker, Adrian Hall, scheduled the victim's forensic interview with the Children's Advocacy Center toward the end of April 2008. Prior to the interview, Ms. Standberry confronted appellant about the allegations. She recalled that the first confrontation occurred via telephone. Following the forensic interview, Detective

Mayo asked her to open a conversation with appellant while wearing a "body wire." Ms. Standberry testified that she did not really want to participate but agreed because she hoped to get the answers she needed to hear. She said that in the conversation, appellant admitted to touching the victim inappropriately.

Ms. Standberry spoke with appellant again at Detective Mayo's request. She participated in a "controlled phone call." She did not recall if appellant made any admissions during the second conversation. Since the inception of the investigation, Ms. Standberry has had no further contact with appellant and has not allowed her children any further contact with him. On cross-examination, Ms. Standberry admitted that she lied to appellant during the conversation in which she wore a body wire and that she did so as a tactic to obtain a confession from him.

Detective Joshua Mayo with the Metro Nashville Police Department testified that he was a detective assigned to the Sexual Abuse Unit in January 2008. He became involved in the instant case as a result of an offense report taken by a field officer. The report was forwarded to his unit. Detective Mayo testified that in an ideal situation, a DCS worker would have contacted someone in his unit at the beginning of the investigation, but in the instant case, he did not have contact with DCS until after his unit received the initial offense report. Detective Mayo and Adrian Hall with DCS played "phone tag," and the forensic interview was eventually scheduled for April 2008. Because of the team approach that the department followed, Detective Mayo did not take the initiative to interview the victim. He testified that in cases involving victims thirteen years of age and younger, the department entrusted DCS to conduct the interviews because of the specialized skills and training the workers received. He further testified that the forensic interview is a necessary first step to determine in what direction the investigation should proceed.

During the time between receiving the initial report and the forensic interview, Detective Mayo spoke with Ms. Standberry by telephone approximately two times. He recalled that she seemed to not know what to believe, that she wanted to believe her daughter, but that she seemed shocked and unaware that any wrongdoing had occurred. After he received the results of the forensic interview, Detective Mayo determined that the case was ripe for a suspect interview of appellant. He contacted Ms. Standberry and requested that she wear a body wire during a conversation with appellant. He testified that the use of a body wire is a common law enforcement tool utilized frequently in the Sexual Abuse Unit because often perpetrators are dishonest with police officers but are more truthful with family members. Although Ms. Standberry seemed nervous, she agreed to participate.

Detective Mayo testified that as a common safety practice, officers prefer to be able to observe the conversation visually. He and other detectives positioned themselves in a

vehicle on a side street with a view of Ms. Standberry's driveway. After Detective Mayo authenticated the tape recording of the conversation and the transcript thereof, the court admitted both items into evidence and allowed the State to play the tape for the jury.

Detective Mayo explained to the jury that he wanted to obtain more specific details and clarify some issues, so he asked Ms. Standberry to participate in a controlled phone call. He utilized a system in the police department that mimicked a particular telephone number so that Ms. Standberry's telephone number would display on the caller identification when she initiated the call to appellant even though she called from a telephone within the police department. Following the controlled phone call, Detective Mayo contacted appellant and asked him to come to the police department and discuss the allegations. During the interview, appellant told Detective Mayo repeatedly that he was "one-hundred percent innocent." Appellant never acknowledged that he had a long conversation with Ms. Standberry or that during the conversation with her he admitted touching the victim inappropriately. Appellant told Detective Mayo that his relationship with Ms. Standberry was good and that he loved the children. Detective Mayo asked appellant for a DNA sample, which he declined to give.

Detective Mayo testified that the victim was not subject to a medical examination. The department's standard protocol is that a victim should be examined within seventy-two hours of sexual contact with a perpetrator.

Hollye Gallion, the clinic director of Our Kids' Center in Nashville, testified as an expert witness. The primary purpose of the center is to perform medical examinations on child victims of sexual abuse. Ms. Gallion is a pediatric nurse practitioner who performs medical examinations. She offered general testimony about the anatomy of a female and the possibility that a perpetrator could penetrate a female victim without rupturing the hymen or penetrating the vagina. She testified that in cases involving allegations of digital or penile penetration, ninety-three percent of the children have completely normal findings after examinations. Ms. Gallion reiterated that she did not examine the victim.

Following the close of the State's proof, the State read to the jury an election of offenses. The pertinent facts describing each count are as follows:

> Count One: aggravated sexual battery based upon appellant's fondling of the victim's breasts when the victim and appellant lived on Apache Trail. The fondling occurred at night, in the victim's bedroom, when appellant and the victim were in the house;

Count Two: aggravated sexual battery based upon appellant's fondling of the victim's breasts while he was on top of her and moving back and forth. The fondling occurred in the residence on Apache Trail, at night, in the victim's bedroom, when appellant and the victim were in the house;

CounThree: aggravated sexual battery based upon appellant's forcing the victim to fondle his penis. The act occurred while appellant and the victim lived on Apache Trail. Appellant and the victim were in the house, and the fondling occurred at night in the victim's bedroom;

Count Four: aggravated sexual battery based on appellant's forcing the victim to fondle appellant's penis while appellant was on top of her. The fondling occurred in the residence on Apache Trail, at night, in the victim's bedroom, when appellant and the victim were in the house;

Count Five: aggravated sexual battery based on appellant's fondling the victim's genital area with his hand. The fondling occurred in the residence on Apache Trail, at night, in the victim's bedroom, when appellant and the victim were in the house and the victim was lying on her bed;

Count Six: aggravated sexual battery based on appellant's fondling the victim's genital area over her clothes. The fondling occurred in the residence on Apache Trail, at night, in the victim's bedroom, when appellant and the victim were in the house and the victim was lying on her bed;

Count Seven: rape of a child based on appellant's penetrating the victim's genitals with his penis, described by the victim as appellant being on top of her and moving back and forth and was the first of seven to nine such instances. The rape occurred in the residence on Apache Trail, at night, in the victim's bedroom, when appellant and the victim were in the house;

Count Eight: rape of a child based on appellant's penetrating the victim's genitals with his penis until he ejaculated, described by the victim as a time in which appellant also forced the victim to touch his genitals with her hand. The rape occurred in the residence on Apache Trail, at night, in the victim's bedroom, when appellant and the victim were in the house;

Count Nine: rape of a child based on appellant's penetrating the victim's genitals with his penis. The rape occurred in appellant's residence on Linbar

Drive and was the first incident described by the victim as occurring at appellant's residence; and

Count Ten: rape of a child based on appellant's penetrating the victim's genitals with his penis until he ejaculated. The rape occurred in appellant's residence on Linbar Drive and was the only time the victim went into the bathroom to remove her own clothes.

The court held a jury-out hearing to discuss the evidence as it related to the counts of the indictment and dismissed Count 2 of the indictment. The defense presented no proof. The jury returned verdicts of guilty on all remaining counts.

### C. Facts from Sentencing

Neither party presented witnesses at the sentencing hearing. The court considered, on the record, the evidence presented at trial, the presentence report, the principles of sentencing, the nature and character of the criminal conduct, enhancing and mitigating factors, statistical information, and appellant's statements.

The trial court found enhancement factor number one, that appellant has a previous history of criminal behavior in addition to that necessary to establish the range of punishment, was proven by a preponderance of the evidence by the victim's testimony regarding uncharged conduct in the instant case. *See* Tenn. Code Ann. § 40-35-114(1) (2006). The court declined to apply enhancement factor number seven, that the offense involved a victim and was committed to gratify appellant's desire, pleasure, or excitement, because the victim's testimony related to the offenses themselves and could not be considered as enhancement. *See* Tenn. Code Ann. § 40-35-114(7) (2006). The trial court found enhancement factor number fourteen, that appellant abused a position of public or private trust because he was in a position of step-father, as such. *See* Tenn. Code Ann. § 40-35-114(14). Even after appellant moved out of the home, he remained in a position of trust. The trial court gave little weight to factor number one but gave great weight to factor number fourteen. *Id.* § 40-35-114(1), (14). The court found no mitigating factors. Accordingly, the trial court sentenced appellant as a Range I standard offender to ten years each on Counts One, Three, Four, Five, and Six and twenty years each on Counts Seven, Eight, Nine, and Ten.

In determining concurrent versus consecutive sentences, the trial court considered Tennessee Code Annotated section 40-35-115(b)(5), which applies to offenses wherein appellant is convicted of two or more statutory offenses involving the sexual abuse of a minor, with consideration of the aggravating circumstances arising from the relationship

between appellant and the victim, the timespan of undetected sexual activity, the nature and scope of the acts, and the extent of the residual physical and mental damage to the victim. The trial court found that the sexual activity went on for a period of time, that appellant held a close position of trust, and that the nature and scope of the acts were multiple. The trial court ordered the sentences for Counts One and Three to run consecutively to each other and Counts Four, Five, and Six to run concurrently with Counts One and Three. The sentences for all four counts of rape of a child were to run concurrently with each other but consecutive to Counts One and Three, for an effective forty-year sentence to be served at 100%.

## II. Analysis

### A. Trial Court's Denial of Appellant's Motion to Suppress

Appellant argues that the trial court should have suppressed the statements he made to Ms. Standberry because she was working as an agent of the State, and appellant's statements were the product of her coercion. The State counters that the trial court did not abuse its discretion in denying appellant's motion.

A trial court's determination of issues at a suppression hearing is presumptively correct on appeal. *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn. 1994) (citing *State v. Harbison*, 704 S.W.2d 314, 318 (Tenn. 1986)), *abrogated on other grounds by State v. Saylor*, 117 S.W.3d 239 (Tenn. 2003). A trial court's findings of fact at a hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001). As the trier of fact, the trial court is in a better position to assess the witnesses' credibility, determine the weight of the evidence and the value to be afforded it, and resolve any conflicts in the evidence. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). However, the trial court's conclusions of law are not binding on this court. *State v. Randolph*, 74 S.W.3d 330, 333 (Tenn. 2002). Further, the trial court's applications of law to the facts are questions of law that we review de novo. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). On appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)).

In *State v. Burroughs*, 926 S.W.2d 243, 246 (Tenn. 1996), our supreme court adopted the "legitimate independent motivation test" for determining whether a private individual acted as an agent of the State. Although the test was originally developed for determining the admissibility of evidence following a Fourth Amendment violation by a citizen, our supreme court as well as other courts have found it instructive in determining whether a Fifth

Amendment violation had occurred.  *State v. Brandon Ackerman*, No. M2010-01979-CCA-R3-CD, 2012 WL 2870568, at \*24 (Tenn. Crim. App. July 13, 2012) (citing *United States v. Day*, 591 F.3d 679, 683 (4th Cir. 2010) ("[R]egardless of whether the Fourth or Fifth Amendment is at issue, we apply the same test to determine whether a private individual acted as a Government agent.")).  "The goal of the test . . . is to determine whether 'the government exercised such coercive power or such significant encouragement that it is responsible for the conduct of the private party securing the evidence, or that the exercised powers are the exclusive prerogative of the government.'" *Id.* at \*24 (quoting *United States v. Garlock*, 19 F.3d 441, 443 (8th Cir. 1994) (citation omitted in original)).  The pivotal inquiries under the "legitimate independent motivation" analysis are: "(1) the government's knowledge and acquiescence; and (2) the intent of the party performing the search." *Burroughs*, 926 S.W.2d at 246.  However, our supreme court places greater weight on the second factor.  *Id.*  Thus, to prevail on his claim and invoke constitutional protections, appellant must demonstrate that government knew about and acquiesced in Ms. Standberry's conduct and that she lacked independent motivation to cooperate.

In its order denying appellant's motion to suppress, the trial court made extensive findings of fact.  It also concluded, as a matter of law, that "the State was aware of the action as the Metro Police Department detectives helped set up the body wire logistics."  We agree with the trial court's determination that the government knew about and acquiesced in Ms. Standberry's participation in the case.  However, the trial court further concluded that Ms. Standberry had an independent motivation for participating in the body wire operation.  We agree.

In its findings of fact, the trial court noted that Ms. Standberry testified that she wanted to confront appellant about the allegations regardless of police involvement because she needed closure; that in the recorded conversation, Ms. Standberry repeated the same motivation to appellant; and that she told appellant that she would not be satisfied until she heard the truth from him and that she wanted to get help for her daughter.  We agree with the trial court's conclusion that "it is completely reasonable that a parent would be independently motivated to confront [her] child's alleged molester to try to find out what happened to their child."  Based on our analysis, Ms. Standberry was not working as an agent of the State in confronting appellant while wearing a body wire.  In so holding, we distinguish this case from the *Brandon Ackerman* case in which this court determined that there was no evidence adduced at the evidentiary hearing to support the trial court's finding that the mother of the victim acted with a legitimate independent motivation.  *Brandon Ackerman*, 2012 WL 2870568, at \*25.  The facts of the instant case clearly establish that Ms. Standberry testified at both the evidentiary hearing on the motion to suppress and at trial that she wanted to obtain closure for herself and her daughter by learning the truth behind the allegations against appellant.

-12-

Because we find that Ms. Standberry was not acting as a State actor, we need not continue our inquiry to determine whether appellant's statements were voluntary. "If she did not [wear the body wire] as an agent of the state, then her actions, no matter how offensive or outrageous, would not require suppression of [appellant's] statements." *Brandon Ackerman*, 2012 WL 2870568, at *24 (citing *Colorado v. Connelly*, 479 U.S. 157, 166 (1986) ("The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause.")). This court observed, "The sole concern of the Fifth Amendment . . . is governmental coercion." *Id.* (citing *Connelly*, 479 U.S. at 170). However, we will address the issue of whether appellant's statements were voluntary to facilitate any further appellate review.

"The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *Stephenson*, 878 S.W.2d at 544). To be considered voluntary, a statement to law enforcement "'must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" *State v. Brock*, 327 S.W.3d 645, 687 (Tenn. Crim. App. 2009) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). Therefore, "voluntariness" hinges upon the inquiry of "'whether the behavior of the [s]tate's law enforcement officials was such as to overbear [appellant's] will to resist and bring about confessions not freely self-determined . . . .'" *State v. Kelly*, 603 S.W.2d 726, 728 (1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)). However, "[a] defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *Brock*, 327 S.W.3d at 687 (quoting *Smith*, 933 S.W.2d at 455). Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary . . . ." *Id.* (quoting *Smith*, 933 S.W.2d at 455). The voluntariness of a statement is determined by an examination of the totality of the circumstances. See *Kelly*, 603 S.W.2d at 728-29.

The totality of the circumstances reveals that appellant was not coerced by Ms. Standberry into making a statement or confession. This court relies on the following factors in so determining: (1) appellant was not in custody; (2) Ms. Standberry maintained a stern, yet non-argumentative tone; (3) the conversation occurred outdoors, i.e., appellant could not have reasonably felt confined or not free to leave at any time; and (4) the conversation occurred within a few feet of appellant's vehicle, to which he held the keys, allowing him to leave at any time. While Ms. Standberry admittedly lied to appellant with regard to ceasing the investigation against him, she was not acting under instructions from law enforcement to do so. Her actions were the product of her legitimate motivation to seek the truth about the allegations of sexual abuse involving her daughter. Ms. Standberry's tactics did not overbear appellant's will, and we find his statements to be voluntarily given.

Moreover, any error was harmless in light of the relatively non-incriminatory nature of appellant's statements. He admitted to inadvertent touches only and did not incriminate himself with regard to any intentional acts of sexual abuse. Appellant did not testify at trial, thus, there were no inconsistencies with which to impeach him. Appellant is not entitled to relief on this issue.

## B. Trial Court's Denial of Motion for Acquittal

Appellant argues that the trial court erred in denying his motion for judgment of acquittal. Appellant's motion was based upon an alleged material variance between the bill of particulars filed by the State and the evidence adduced at trial upon which the State made its election. The State argues that the trial court properly denied the motion and that appellant has failed to demonstrate that he was misled or prejudiced in any way.

A motion for judgment of acquittal raises a question of law, i.e., the legal sufficiency of the evidence, for determination by the trial court. *State v. Adams*, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995) (citing *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983)). Thus, on appeal, this court applies the same standard of review both to the trial court's denial of a motion for a judgment of acquittal and to the sufficiency of the convicting evidence underlying the jury's verdict. *State v. Carroll*, 36 S.W.3d 854, 869 (Tenn. Crim. App. 1999) (citing *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998)). Therefore, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on this claim of error, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury

has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729; *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In this case, the State filed a bill of particulars outlining the facts underlying the ten counts of the indictment. A bill of particulars serves three purposes. *State v. Sherman*, 266 S.W.3d 395, 408 (Tenn. 2008). The bill of particulars first provides a "defendant with information about the details of the charge against him if this is necessary to the preparation of his defense." *Id.* (quoting *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991)). Second, the bill assures that a defendant can arm himself against "prejudicial surprise at trial." *Id.* at 409 (quoting *Byrd*, 820 S.W.2d at 741). Finally, the bill enables the defendant to preserve a plea against double jeopardy. *Id.* (citing *Byrd*, 820 S.W.2d at 741).

The evidence upon which the State relied in submitting its election to the jury varied in some regards from the bill of particulars. "'A variance between an indictment or a subsequent bill of particulars and the evidence presented at trial is not fatal unless it is both material and prejudicial.'" *State v. Osborne*, 251 S.W.3d 1, 15 (Tenn. Crim. App. 2007) (quoting *State v. Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000)). When substantial correspondence exists between the proof and the indictment or bill of particulars, the variance is not material. *Id.* (citing *Shropshire*, 45 S.W.3d at 71). "When the indictment and the proof substantially correspond, the Defendant is not misled or surprised at trial, and there is protection against a second prosecution for the same offense, the variance is not considered material." *Id.* (*State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984)).

Appellant was charged in a ten-count indictment. The trial court dismissed Count Two for insufficient evidence. Appellant claims that each count of the indictment suffers a fatal variance because the bill of particulars alleged that each occurrence took place at the home on Valley Brook Drive, but the victim testified that the offenses took place in the home on Apache Trail and in appellant's apartment on Linbar Drive. We decline to find that this variance is material or that appellant suffered prejudice therefrom. This court has long been "sensitive to the fact that young children who are victims of child abuse may not be able to testify that abuse occurred on a specific date, or provide extensive details in this regard." *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999). The State narrowed the offense dates

-15-

in question to a period of time between September 1, 2005, and January 25, 2008, times during which appellant lived at both residences to which the victim testified. He had adequate notice about the offenses against which he must prepare to defend.

With the exception of the difference in residences, our review and comparison of the bill of particulars with the State's election reflects that Counts One and Five substantially correspond in nature, although the numbers seem to be reversed. *See id.* ("Although the numbers assigned to the offenses listed as separate counts in the amended bill of particulars and the State's election of offenses are sometimes different, the charged offenses as reflected in the two documents substantially correspond."). We conclude that Counts Three and Four are similar in nature in both documents. Counts Nine and Ten are sufficiently similar in both documents, with the exception that Count Nine of the bill of particulars alleged that the rape occurred in "her" room, and the testimony at trial reflected that the rape occurred in appellant's apartment, in which the victim had no room.

The most notable variances between the bill of particulars and the State's election are found in Counts Six, Seven, and Eight. Count Six is a count of aggravated sexual battery, and the variance relates to the part of the victim's body that was alleged to have been inappropriately touched. Counts Seven and Eight are counts of rape of a child, and the variance is based on the part of appellant's body with which he penetrated the victim. In his brief, appellant focuses this court's attention on the difference in the locations at which the offenses occurred but mentions merely in passing that the proof elected by the State differed from the bill of particulars in the conduct that was alleged.

Our legislature has defined "sexual penetration" as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body . . . ." Tenn. Code Ann. § 39-13-501(7) (2006). The sexual contact required to sustain a conviction of aggravated sexual battery is defined as "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* § 39-13-501(6). "Intimate parts" include "the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id.* § 39-13-501(2).

Count Six of the bill of particulars alleged that appellant touched the victim's breasts with his hand. The State's election for this offense alleged that appellant touched the victim's genital area over her clothes. Counts Seven and Eight of the bill of particulars alleged that appellant vaginally penetrated the victim with his hand, but the State's elections

alleged that he penetrated the victim with his penis. The bill of particulars also noted where the offenses occurred.

We conclude that despite the inconsistencies between the bill of particulars and the State's elections, the State provided appellant with enough details of the offenses to allow him to prepare a defense. In light of the statutory definitions of the offenses, both the bill of particulars and the State's elections encompassed conduct that constitutes aggravated sexual battery and rape of a child. Appellant was protected from unfair surprise at trial. Finally, appellant cannot be prosecuted twice for the same offenses alleged in this case. Double jeopardy prohibits subsequent prosecution of appellant for offenses against the victim occurring within the time frame the State alleged in the indictment. *State v. Jones*, 953 S.W.2d 695, 700 (Tenn. Crim. App. 1996); *State v. Anderson*, 748 S.W.2d 201, 203 (Tenn. Crim. App. 1985). The bill of particulars provided appellant the necessary protections to ensure due process.

We must next determine whether the variance between the bill of particulars and the State's elections is material and prejudicial. The prohibited conduct is the same criminal offenses in both the bill of particulars and the elections. Similarly, this court has previously held that a variance was not material when an indictment alleged the defendant performed an oral sex act on a child, but the proof established that the victim fellated the defendant. *State v. Jones*, 953 S.W.2d 695, 700 (Tenn. Crim. App. 1996) (citing *State v. Steven K. Sterna*, No. 01C01-9007-CR-00163, 1991 WL 135006 (Tenn. Crim. App. July 24, 1991)). Appellant was not misled or surprised at trial. Appellant was indicted for four counts of rape of a child, two of which involved vaginal penetration with his penis. The variance between the proof at trial and the bill of particulars with regard to two counts of rape of a child does not constitute "surprise." Finally, appellant is protected from double jeopardy. "When the indictment and the proof substantially correspond, the Defendant is not misled or surprised at trial, and there is protection against a second prosecution for the same offense, the variance is not considered material." *Osborne*, 251 S.W.3d at 15 (citing *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984)). We conclude that the variances are immaterial.

Appellant has failed to argue or even address the issue of prejudice. Appellant failed to demonstrate either during or after trial that he was prejudiced by the prosecution's election of offenses that involved different means of aggravated sexual battery or unlawful penetration than that described in the bill of particulars. *See State v. Speck*, 944 S.W.2d 598, 601 (Tenn. 1997). Appellant categorically denied the charges in his statement to law enforcement. He did not offer a defense geared toward those specific acts. *See id.* "Similarly, [appellant] did not offer any defenses post-trial that he would have used at trial were it not for the specific [acts] set forth in the bill of particulars." *Id.*; *see also State v. Ealey*, 959 S.W.2d 605, 609 (Tenn. Crim. App. 1997) (holding that appellant "failed utterly"

to demonstrate how he suffered prejudice by not offering on this appeal any defenses that may have been available to him were it not for the variances between the bill of particulars and the State's proof). Accordingly, we conclude that appellant has failed to demonstrate that he was prejudiced in his defense at trial. He is not entitled to relief on this issue.

## C. Imposition of Partial Consecutive Sentences

Appellant challenges the propriety of the trial court's imposition of partial consecutive sentences in his case. Notably, he does not challenge the imposition of ten-year sentences for his Class B felony convictions or twenty-year sentences for his Class A felony convictions.

## 1. Standard of Review

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b) (2010). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4) (2010).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, ___ S.W.3d ___, No. E2011-00005-SC-R11-CD, 2012 WL 4380564, at \*17 (Tenn. Sept. 26, 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Id.* at 17. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2010), Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

A trial court may, in its discretion, order sentences to run consecutively to each other if it finds one of seven criteria by a preponderance of the evidence. Tenn. Code Ann. § 40-35-115(b) (2006). Imposition of consecutive sentences must be "justly deserved in relation to the seriousness of the offense." *Id.* § 40-35-102(1). The length of the resulting consecutive sentence must be "no greater than that deserved for the offense committed." *Id.* § 40-35-103(2). In this case, the trial court considered Tennessee Code Annotated section 40-35-115(b)(5) in arriving at partial consecutive sentences:

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims.

The relationship between appellant and the victim cannot be contested. Appellant was the victim's quasi-step-father, or at least held a position of trust and authority within the household as the live-in boyfriend of the victim's mother and father of the mother's son. The victim testified that the abuse spanned approximately two and a half years. Our supreme court and this court have approved of consecutive sentencing in cases with far less of a time span. *See, e.g., State v. Lane*, 3 S.W.3d 456, 460 (Tenn. 1999) (among the circumstances that justified imposition of consecutive sentences was the fact that appellant engaged in the "egregious conduct" for over a month); *State v. Richard L. Meyer*, No. 01C01-9902-CC-00034, 1999 WL 994046, at *2 (Tenn. Crim. App. Nov. 3, 1999) (in finding that appellant clearly qualified for consecutive sentencing, court noted that abuse of victim lasted for several months and included digital penetration).

The trial court reviewed the acts of sexual abuse against the victim in this case, finding that they were "multiple." Our state courts have attempted to delineate the severity of sexual abuse that will warrant application of consecutive sentencing. *See State v. Osborne*, 251 S.W.3d 1, 28 (Tenn. Crim. App. 2007) (concluding that evidence of sexual acts including cunnilingus, fellatio, digital penetration, and masturbation was sufficient to support imposition of consecutive sentencing); *but cf. State v. Cleander Cleon Hartman, Jr.,* No. M2000-02441-CCA-R3-CD, 2002 WL 65996, at *17 (Tenn. Crim. App. Jan. 17, 2002) (consecutive sentencing not warranted where contact was limited to touching and fondling, never escalated, and did not involve penetration or oral contact). We conclude that the abuse the victim suffered in this case is of the more severe nature described in *Osborne* and warrants imposition of at least partial consecutive sentences.

Finally, while the State did not present psychological evidence regarding the emotional and mental harm to the victim, the trial court considered the evidence adduced at trial, which included the victim's testimony that she was suffering anger issues. "Based on our review of the record, a combination of concurrent and consecutive sentences is appropriate in relation to the severity of the offenses and are the least severe measures necessary to deter [appellant's] future criminal conduct, to protect society, and to deter others who are similarly situated and may be likely to commit similar offenses." *Osborne*, 251 S.W.3d at 28-29. The trial court properly imposed partial consecutive sentences, and a forty-year sentence is reasonably related to the severity of appellant's crimes.

## CONCLUSION

Based on our review of the record, the parties' briefs, and the applicable case law, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE